UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| NORTH KINGSTOWN SCHOOL | : | |
| COMMITTEE, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | C.A. No. 13-605S |
| | : | (consolidated with C.A. No. 13-601S) |
| JUSTINE R., as Parent of M.R., | : | |
| Defendant. | : | |

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

These consolidated cases[1] present an administrative appeal from the decision of a

Hearing Officer under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400, *et seq.*

("IDEA"), R.I. Gen. Laws § 16-24-1, *et seq.*, and its implementing Board of Education

Regulations Governing the Education of Children with Disabilities ("R.I. SPED Regulations").

They juxtapose the struggle of the parent ("Parent") of a student ("M.R.") to get a free and

appropriate public education ("FAPE")[2] with respect to toileting for her then seventeen-year-old

autistic, mentally-retarded, mood-disordered, obese son, and the struggle of the North Kingstown

School Committee ("School") to provide it. Because the parties resolved most of their

disagreements after the Hearing Officer issued her decision, as a practical matter, little remains

in dispute beyond M.R.'s entitlement to compensatory education and the Parent's right to

recover her attorney's fees.

---

[1] Justine R. v. North Kingstown, C.A. No. 13-601ML, was filed on August 21, 2013, while North Kingstown v. Justine R., C.A. No. 13-605S, was filed on August 23, 2013. By agreement of the parties, they were consolidated by Order entered on April 28, 2014; at the request of the parties, the Court established North Kingstown v. Justine R., C.A. No. 13-605S, as the lead case to facilitate the student's anonymity.

[2] IDEA mandates that the state must provide all disabled children with a free and appropriate public education as a condition for receiving federal funds. 20 U.S.C. §§ 1401(9), 1412(a)(1)(A).

The cases are now before this Court on cross motions for summary judgment, which are a procedural device by which the parties seek to have the matter decided on the basis of the administrative record.  Bristol Warren Reg'l Sch. Comm. v. R.I. Dep't of Educ., 253 F. Supp. 2d 236, 240 (D.R.I. 2003).  The cross motions have been referred to me for report and recommendation.  The emotionally charged issues presented here are not new to this Court.  The Parent brought an action on April 5, 2013, also challenging the School's management of M.R.'s toileting; that case, now dismissed, resulted in three opinions.[3]  This report and recommendation assumes the reader's familiarity with them.

## I.     BACKGROUND

### a.  Factual and Procedural History[4]

M.R. suffers from mental retardation, autism, obesity and a mood disorder.  Parent Justine R.'s Statement of Undisputed Facts ("PSUF") ¶ 1.  He has received special education services from the School since the age of three; since at least 2002, he has also received weekly wrap-around services, at home and in the community.  PSUF ¶¶ 2, 5-6.  Much of the focus of his education has been aimed at teaching social skills and activities of daily living.  PSUF ¶¶ 10-12;

---

[3] In R. v. North Kingstown School Department, C.A. No. 13-222S, 2013 WL 4042658 (D.R.I. April 30, 2014) ("North Kingstown I"), this Court denied the Parent's motion to remand her petition for injunctive relief.  In R. v. North Kingstown School Department, C.A. No. 13-222S, 2013 WL 4047468 (D.R.I. May 6, 2014) ("North Kingstown II"), this Court denied the Parent's prayer for an injunction because no evidence had been presented to establish likelihood of success.  In R. v. North Kingstown School Department, C.A. No. 13-222S, 2013 WL 4047139 (D.R.I. June 13, 2014) ("North Kingstown III"), this Court held an evidentiary hearing regarding the School's compliance with the Interim Order of the Rhode Island Commissioner of Education and found that the Parent had failed to sustain her burden of proving non-compliance.  This Court accepted all three reports and recommendations on August 9, 2014, in R. v. North Kingstown School Department, C.A. No. 13-222S, 2013 WL 4047466 (D.R.I. Aug. 9, 2014) ("North Kingstown IV").  The Parent's appeal to the First Circuit Court of Appeals was voluntarily dismissed on joint motion of the parties filed on December 4, 2013.  R. v. North Kingstown School Department, No. 13-2100 (1st Cir. Dec. 16, 2013).  The Court takes judicial notice of these opinions from the prior case.  See Airframe Sys., Inc. v. Raytheon Co., 520 F. Supp. 258, 262 (D. Mass. 2007).

[4] Except where otherwise indicated, these facts and the procedural history are drawn from the parties' Statements of Undisputed Facts to the extent that they are unchallenged, from the testimony and exhibits comprising the administrative record, from the supplemental administrative record filed by the Parent with leave of this Court and from North Kingstown I, North Kingstown II and North Kingstown III.

School ("S.") Ex. 4. Despite these intensive efforts, M.R. remains severely limited. As described in a neuropsychological evaluation procured by the School in early 2013, he functions in the "extremely low range when performing basic academic skills such as reading, writing, and mathematics as well as functional skills such as measurement and telling time" and his independence in self-care and activities of daily living is rated as "extremely low." Parent Justine R. ("P.") Ex. 10 at 9-10. It is unlikely that he will have the ability to live independently at any point in his life. P. Ex. 10 at 13.

M.R. has not learned to be fully independent in toileting. PSUF ¶ 16. While he is capable of knowing when he needs to go, he has yet to master fully the skill of wiping himself. PSUF ¶¶ 20, 59. As a result, one of the educational goals incorporated into M.R.'s pre-litigation individualized education plan ("IEP") was "[m]onitor hygiene in bathroom." PSUF ¶¶ 20, 32, 59; S. Ex. 4. The hoped-for education achievement is for M.R. to gain full independence in this critical skill, but until that is achieved, basic hygiene and health considerations require that he must be kept clean. To work toward independence but consistently achieve cleanliness, M.R.'s Parent, wrap-around service providers and the teachers at his 2013 summer placement[5] developed the procedure of requiring M.R. to wipe himself, after which a caretaker does a final wipe to ensure that he is clean. PSUF ¶¶ 17, 132, 133. This procedure was successful in that M.R.'s Parent did not observe soiled underwear either at home or when he returned home from

---

[5] The evidence regarding M.R.'s toileting at the Sargent Rehabilitation Center ("Sargent") during the summer of 2013 was not before the Hearing Officer because it occurred after the Due Process Hearing terminated. With leave of this Court, the Parent supplemented the record with the materials on which these facts are based over the objection of the School pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii). Whether to consider such evidence and the weight to afford it is "left to the discretion of the trial court which must be careful not to allow such evidence to change the character of the hearing from one of review to a trial *de novo*." Town of Burlington v. Dep't of Educ., 736 F.2d 773, 791 (1st Cir. 1984). Here, the supplemental evidence regarding M.R.'s summer placement corroborates the evidence presented at the Due Process Hearing pertaining to M.R.'s toileting experience with his wrap-around service providers. In addition, the supplemental evidence provides relevant information regarding the outcome of the IEP meetings held while the Due Process Hearing was in progress. As evidence of relevant events occurring subsequent to the administrative hearing, I consider this supplemental evidence in this report and recommendation. Id. at 790.

wrap-around services or his summer placement.  PSUF ¶¶ 102, 134.  By contrast, M.R.'s

toileting success at School was mixed.  However, until the 2012-2013 school year, whenever the

Parent observed a pattern of soiled underwear, she approached School officials who addressed

the situation so that M.R. resumed coming home clean.  PSUF ¶¶ 23-24, 27-31.

During the 2012-2013 school year, the problem recurred as M.R. repeatedly came home

from School with soiled underwear.  PSUF ¶¶ 33, 58.  Initially, the Parent attempted to resolve

the matter by working with M.R.'s teachers.  PSUF ¶ 35.  When this did not yield success, she

attended IEP meetings on January 22, 2013, and February 28, 2013.  PSUF ¶¶ 36, 57.  M.R.'s

wrap-around providers came and described their successful toileting procedure.  PSUF ¶¶ 36, 41,

57.  Between the January and February IEP meetings, the Parent brought M.R. to a

gastroenterologist who ruled out any organic pathology that might be causing soiling at School;

this physician opined that "[i]t is more likely that given his special needs he just needs some

extra assistance during the day with cleaning and hygiene."  PSUF ¶¶ 55-56; P. Ex. 17.  The

School was unmoved – at the conclusion of the February 28, 2013, IEP meeting, the School's

new Director of Pupil Personnel Services, Dr. Patricia Pezzullo, told the Parent that "it is not

appropriate for school personnel to wipe" M.R. in a public school setting.  PSUF ¶ 64.  While the

School adopted the suggestion of M.R.'s wrap-around occupational therapist that it consider use

of a bidet to ensure M.R.'s cleanliness at School and agreed to check him more frequently, it

refused to do the final wipe.  PSUF ¶¶ 43-45.  Concerned that this refusal would expose M.R. to

potentially serious adverse health consequences from an incomplete wipe,[6] the Parent removed

M.R. from School, PSUF ¶ 68, and initiated two administrative proceedings.

_____

[6] The Parent's fear of adverse health consequences was not unfounded.  M.R. has required treatment for E. coli as a
result of inadequate attention to toileting.  P. Ex. 20 at 2.  In April 2013, he developed an anal fissure.  PSUF ¶ 90.

First, to secure M.R.'s ability safely to return to School during the pendency of the due process proceeding, on March 6, 2013, the Parent requested interim relief – an order that the School provide "appropriate toileting assistance, including wiping" – from the Rhode Island Commissioner of Education ("Commissioner"), pursuant to R.I. Gen. Laws § 16-39-3.2, which empowers the Commissioner "to issue any interim orders pending a hearing as may be needed to ensure that a child receives education in accordance with applicable state and federal laws and regulations during the pendency of the matter." North Kingstown I, at *2. Second, she filed a Request for Special Education Due Process Hearing ("Due Process Hearing") on March 12, 2013, that raised five issues,[7] leading with her claim that "North Kingstown has failed to provide [M.R.] with appropriate assistance in his hygiene needs/life skills training when toileting." P. Ex. 15. This request for a Due Process Hearing resulted in the proceeding that is the subject of these appeals.

The Commissioner went forward first. Pursuant to the requirement of R.I. Gen. Laws § 16-39-3.2, five working days after she received the Parent's request, the Commissioner convened an administrative hearing before a hearing officer to determine whether M.R.'s IEP requires that the School wipe him to assure cleanliness. This hearing resulted in the Interim Order and Decision, issued on April 2, 2013, which unambiguously found that the School's position that it is inappropriate for school personnel to wipe a student in the public school setting is "categorically incorrect." PSUF ¶ 69; P. Ex. 20 at 3. In the hearing officer's decision, the Commissioner interpreted the requirement of M.R.'s IEP that the School must "monitor hygiene in bathroom" and found:

---

[7] Four of the five claims – all except the one related to toileting – were resolved by the time the Due Process Hearing ended. They will not be mentioned further.

> Returning to Doe's IEP, . . . Staff must inspect Doe's buttocks after he attempts to
> wipe himself and if Doe is not clean, staff must take steps to make him clean. If Doe
> is physically unable to complete the job himself, staff must clean Doe. If this requires
> wiping, staff must wipe Doe. In Doe's case, this is the related health service that his
> IEP requires.

P. Ex. 20 at 4. The Commissioner also ordered the School to provide M.R. with compensatory services for the time he had missed from School as a result of its refusal to provide appropriate toileting assistance. P. Ex. 20 at 5.

After the Interim Order issued, the School did not take an appeal, but instead approached the Parent about scheduling an IEP meeting to address hygiene and the compensatory education mandated by the Interim Order. North Kingstown II, at *2; North Kingstown III, at *1 n.2. Further, within less than forty-eight hours after the Interim Order issued, the School categorically stated its intent to comply, and within three days had developed a protocol to do so. See North Kingstown II, at *1; North Kingstown III, at *1. However, the Parent would not wait – distressed by the School's past intransigence and ambiguous communications sent before it had had a meaningful opportunity to review the Interim Order, on April 4, 2013, she haled the School into the Superior Court to get an order to enforce. North Kingstown II, at *3. The School removed, bringing the dispute to this Court, which found federal subject matter jurisdiction based on IDEA. North Kingstown I, at *8.

In this Court, the Parent's first motion for an injunction to enforce the Interim Order was rejected because she presented no evidence establishing that the School did not intend to comply; to the contrary, the School had made plain its intent to comply. North Kingstown II, at *2. In response to her second attempt to prove that the School was not complying, this Court held an evidentiary hearing. Despite the School's admission that it had to deal with union issues arising from the Interim Order's requirement that its personnel must wipe M.R., which it circumvented

by issuing a directive to the paraprofessional, PSUF ¶ 80, this Court nevertheless found that the School acted appropriately by developing a protocol for the paraprofessional assigned to M.R., who completes the wiping as required by the Interim Order. North Kingstown III, at *2. Although the Parent testified that her son sometimes came home with soiled underwear and once came home with a soiled shirt, this Court found that the School had abandoned its pre-Interim Order position of resistance and was complying. The Parent's prayer for an injunction was denied because she had failed to sustain her burden of proving non-compliance. North Kingstown III, at *3. She voluntarily dismissed her appeal to the First Circuit in December 2013, ending the Interim Order litigation except for the issue of attorney's fees. Justine R. v. N. Kingstown Sch. Dep't, No. 13-2100 (1st Cir. Dec. 16, 2013).

While the Parent's unsuccessful effort to get an injunction to back up the Interim Order was proceeding in this Court and in the Court of Appeals, the Due Process Hearing got underway before an impartial hearing officer ("Hearing Officer") as required by IDEA. 34 C.F.R. § 300.511(c). Meanwhile, shortly before the Hearing began, on May 9, 2013, the School asked for a delay so that the parties could convene an IEP meeting; the Hearing Officer denied that motion. Hr'g Tr. 9, Vol. I., May 15, 2013. On May 10, 2013, the Parent again removed M.R. from School based on concerns for his health and safety. PSUF ¶ 94.

One dispute – the disagreement over the presence of a "monitor"[8] during M.R.'s toileting – became a flashpoint as these events unfolded. From the proceedings in this Court, the Parent learned that one of the School's challenges in complying with the Interim Order was the opposition of its paraprofessional union to wiping by its members. PSUF ¶ 80. This caused a

---

[8] The Hearing Officer used the term "monitor" to refer to the second person who observes the paraprofessional managing M.R.'s toileting in the bathroom. In the literature described *infra*, this observer is more often referred to as a chaperone. To avoid confusion, I use the term chosen by the Hearing Officer.

brief delay in the School's development of its plan for compliance; to avoid further delay, the

School directed the paraprofessional to wipe. PSUF ¶ 80; S. Ex. 15. Also from the proceedings

in this Court, the Parent learned that the toileting procedure included a monitor even though this

was not mentioned in the protocol. See PSUF ¶ 81. Several weeks later, from the pre-hearing

discovery produced before the Due Process Hearing, the Parent learned that one of the monitors

was the union president,[9] who had written an email to the Superintendent, which states:

> Until further notice, I have to observe [the paraprofessional] checking on [M.R.'s]
> cleanliness before he gets on the bus to go home. I am not happy!

P. Ex. 41. The Hearing testimony established that this union president had been in discussions

with the Superintendent and others about whether wiping was within the job description of her

union members, as well as that she was not an appropriate choice to observe M.R.'s toileting

because she was not assigned to his classroom. Hr'g Tr. 20-28, 34, Vol. I, May 15, 2013. The

School's Pupil Services Director was unable to explain why the union president was present

during M.R.'s toileting. Hr'g Tr. 34, Vol. I, May 15, 2013. This evidence permits the

disturbing inference that the monitor, at least some of the time, was the union president who had

no reason to be there except for the union agenda. See PSUF ¶¶ 81-84. The Parent,

unsurprisingly, found this inappropriate. Hr'g Tr. 87, Vol. I, May 15, 2013 ("I do [object to

having an observer], especially one that's not assigned into [M.R.'s] classroom.").

    At the Due Process Hearing, the parties presented evidence over four hearing days

between May 15 and June 28, 2013. While the Due Process Hearing was in progress, an IEP

meeting was convened on June 14 and 27, 2013. Hr'g Tr. 3-5, Vol. IV, June 28, 2013; P.'s

Suppl. R., Exs. 1-2 attached to Ex. A. As a result, the parties resolved some of their differences,

---

[9] The testimony at the Due Process Hearing established that this individual was president of the North Kingstown
Educational Support Professionals, an NEA organization, which represents the paraprofessionals, clerks, some bus
monitors, some maintenance and cafeteria staff. Hr'g Tr. 16, 22, Vol. I, May 15, 2013.

agreeing that M.R. would be placed at Sargent for the summer of 2013, that the School would provide busing, and that this placement would satisfy the School's obligation to provide the compensatory time mandated by the Interim Order. PSUF ¶ 122; P.'s Suppl. R., Ex. A; Hr'g Tr. 3-6, Vol. IV, June 28, 2013. The placement at Sargent was very successful from the perspective of toileting: Sargent staff performed the final wipe and M.R. never came home with soiled underwear. PSUF ¶¶ 132, 134.

The Hearing Officer issued her decision on July 26, 2013 ("Decision"). Echoing this Court's findings in North Kingstown III and the Commissioner's ruling in the Interim Order, she concluded that M.R.'s IEP required wiping, that the School had adopted a protocol that included wiping and that the Parent had failed to sustain her burden of proving that the School's implementation of the protocol was so flawed as to constitute the denial of a FAPE. Decision at 24, 28. She found for the Parent only in her conclusion that the School had committed a procedural violation by placing the reference to toileting services in the "Supplementary Aids and Services" section of M.R.'s IEP, instead of the "Related Services"[10] section. In addition to these determinations, she rejected the Parent's argument that the use of the bidet was inappropriate but accepted her contention that the School had not adequately supported its rationale for having a monitor in the bathroom. She ordered that use of a monitor cease immediately. Finally, looking forward to the IEP meeting that would be required to revise M.R.'s IEP to conform to her Decision, she laid out what the revised IEP should cover and entered an additional order directing the School to consult with persons or agencies with

---

[10] "Related service" refers to school health services and developmental, corrective and other supportive services "as may be required to assist a child with a disability to benefit from special education." 20 U.S.C. § 1401(26)(A); 34 C.F.R. § 300.34(a).

experience in working with autistic persons regarding toileting to ensure that an appropriate toileting protocol would be developed for M.R.'s revised IEP. Decision at 29.

The Parent and the School appealed from the Hearing Officer's Decision by filing these cases in this Court on August 21 and 23, 2013.

Meanwhile, M.R.'s positive summer experience at Sargent ended on August 20, 2013; he returned to School in September and toileting trouble resumed. Again the Parent removed him from School – this time, the School filed a truancy petition.[11] ECF No. 17-1 at 4. However, after one or more IEP meetings held in September or October 2013, presumably conducted in compliance with the Hearing Officer's directive that the School consult an expert on how to assist autistic persons with toileting,[12] the School and the Parent agreed to shift M.R. from the twelfth grade to the "Transition Academy," a program provided by the School for students whose disabilities render them eligible for transitional services. As a result of the change to the Transition Academy, M.R. was placed with a different teacher in a different part of the building that has its own bathroom but no bidet. At the hearing on these motions, the Parent advised the Court that this change has resolved her toileting concerns in that she is satisfied with the implementation of the wiping protocol and pleased that the bidet is no longer being used.

The only remaining dispute affecting these parties going forward is the Hearing Officer's ban on a monitor to observe M.R.'s toileting – the School is complying with the Hearing Officer's ban, but would prefer to have the option to assign one. The primary issue to be

---

[11] The Parent also lashed out, filing another complaint with the Rhode Island Department of Education, which was denied, and a disciplinary complaint against the School's attorney, on which the Disciplinary Counsel concluded that no action need be taken. ECF No. 11-1 at 10.

[12] These events were described by counsel at the hearing on these motions for summary judgment but are not referenced in the parties' written submissions. What is clear – and undisputed – is that the IEP meetings in the fall of 2013 appear to have resolved virtually all of the Parent's concerns, leaving only the School's desire to be permitted to consider having a monitor when M.R. is provided toileting assistance and the Parent's prayer for compensatory education and to be deemed a prevailing party for purposes of attorney's fees.

addressed on appeal is the Parent's request that this Court reverse the Decision of the Hearing Officer that the Parent failed to establish that M.R. was denied a FAPE so that M.R. may have compensatory education for the post-Interim Order periods when she removed him from School and so that she will be a "prevailing party" entitled to recover her attorney's fees.

### b. Due Process Hearing and Hearing Officer's Decision

The Hearing Officer's Decision is based on an Impartial Due Process Hearing that took place over four days in May and June 2013, involving testimony from eight witnesses and thirty exhibits. In a nuanced and thoughtful thirty page decision, she addressed the only issue left from the Parent's original due process request – whether the School was "providing a FAPE to [M.R.], specifically, appropriate assistance with life skills training related to his hygiene needs (focus on toileting)." Decision at 10.

The Decision begins with the Hearing Officer's explanation for why she rejected the Parent's pre-hearing motion for the entry of judgment as a matter of law based on the preclusive effect of the Interim Order: it states that the motion was denied because the Interim Order hearing was not a due process hearing, because the Commissioner does not have jurisdiction over the Hearing Officer in a Due Process Hearing and because the Due Process Hearing had not begun but included toileting on which she would have to render a decision.[13] Decision at 8. Nevertheless, with no objection from the School, which has consistently acquiesced in the determinations in the Interim Order, the Hearing Officer adopted in full the Interim Order's mandate that wiping constitutes a "related service" that must be included in M.R.'s IEP. Decision at 21-22.

---

[13] In her list of reasons, the Hearing Officer also stated that the Interim Order "took place prior to the filing of the complaint for the instant Due Process Hearing." Decision at 8. This is not accurate. The Request for Due Process Hearing was filed on March 12, 2013, Decision at 6, while the Interim Order hearing was on March 13, 2013. P. Ex. 20 at 1 n.1.

The Decision turns next to the adequacy of the School's protocol to provide wiping and its implementation of that obligation. Decision at 22-28. It sifts through the considerable evidence presented by the parties, focusing on the School's efforts to comply with M.R.'s IEP, including the adoption and implementation of the protocol and the acquisition of the bidet, and on the Parent's profound dissatisfaction with the School's efforts, based on the number of times M.R. came home with soiled underwear, by comparison with what happened when he was in wrap-around services or at home.[14] With respect to the bidet, the Hearing Officer considered the Parent's accusation that the School acquired it to avoid wiping M.R., and the School's contention that it enhances cleanliness and was not used as a substitute for wiping. Decision at 22. The Decision adverts to the School's failure to allow the Parent to see the bidet or to participate in the development of the protocol in the immediate aftermath of the Interim Order, which the Hearing Officer noted was unfortunate as these actions exacerbated the "controversy and disagreement" between the parties. Decision at 23.

The Decision recites the almost anguished efforts of both the Parent and the School to find an explanation and a solution for M.R.'s seemingly-intractable soiling problem at School. These included the Parent's procuring an extensive gastroenterological examination for M.R., which the Hearing Officer found corroborated the School's hypothesis that at least some of problems resulted from "[M.R.'s] diet, which certainly relates to his size, and that he has soft stools, abdominal noises and gas." Decision at 27. Similarly, the Hearing Officer concluded that the acquisition of the bidet imposed additional expense and effort on the School, as the procurement required "some investigation and analysis" by the School to assess suitability, the installation had to be done properly and staff and students needed "some instruction" to ensure

---

[14] The supplemental record establishes that M.R.'s experience at Sargent was consistent with what the Parent reported at home and with the wrap-around service providers, corroborating the Parent's evidence that the School was failing where other caretakers were succeeding.

proper use.  Decision at 23.  She found that a bidet makes personal hygiene easier, especially for

an obese person like M.R.  Decision at 23.  The Decision does not accept the Parent's contention

that, after the Interim Order, the bidet was used as a substitute for wiping.  Decision at 22-23.

The Decision examines carefully the School's protocol, as described by the

paraprofessional, which built in wiping and constant checking of M.R.'s cleanliness over the

course of the day.  Decision at 16-17, 23-24, 26-28.  While the Parent contends that the

paraprofessional was still refusing to wipe M.R., the Hearing Officer not only found no evidence

that the paraprofessional was uncomfortable wiping M.R. once directed to do so, but also

observed that the paraprofessional did not give the impression during her testimony that wiping

made her uncomfortable.  Decision at 24.  Dr. Pezzulo's testimony regarding whether the

paraprofessional raised any objection to the direction to wipe M.R. is also significant:

> [The paraprofessional] turned to me and she said, "I really don't have any
> problem doing this."  She said, "I was a medic in the military." . . . And she said,
> "I really have no problem doing this."

Hr'g Tr. 37-38, Vol. I, May 15, 2013.  Over all, the Hearing Officer did not discredit the

paraprofessional's testimony that she wipes M.R. until he is clean, that she always checks him

when he arrives, at fixed intervals throughout the day and before he gets on the bus, as well as

that sometimes she discovers that he is soiled; in those instances, she promptly changes him and

sends the soiled underwear home.  Decision at 26; Hr'g Tr. 55, Vol. IV, June 28, 2013; see also

North Kingstown III, at *1-2 (paraprofessional's testimony that she follows protocol in checking

and wiping found to be credible).

While the Hearing Officer noted that one might speculate that the wiping "is not always

done thoroughly," she also found that lack of observation of the wiping by a neutral party makes

it impossible for a fact finder to determine that the Parent had proven that the soiled underwear

was caused by the School's refusal to wipe. Decision at 27-28. In all, the Hearing Officer found that "[t]here was no evidence presented by the [Parent] that proves [M.R.'s] underwear was soiled because the [School] is not wiping him." Decision at 28. Based on these findings, the Hearing Officer held in favor of the School on the only substantive issue presented:

> The burden of proof/persuasion as regards the provision of a FAPE for [M.R.], with a specific focus on the toileting portion of the Issue in this case is on the [Parent], and it is the opinion of this Hearing Officer that the [Parent] has not met its burden.

Decision at 28 (citations omitted). With no denial of a FAPE, the Hearing Officer did not grant the Parent's request for additional compensatory time for the period when M.R. was removed from School beginning shortly before the due process hearing began. Decision at 12-13.

The Decision deals separately with the Parent's discomfort over the presence of a monitor during her son's toileting. Noting that the paraprofessional had adopted the practice of "invit[ing] other paraprofessionals who are not assigned to [M.R.], to observe the toileting protocol," including the union president, Decision at 12, 25, the Hearing Officer rejected the School's claim that the profound distrust between the Parent and the School justified the monitor and found it unlikely that the Parent would sue the School for inappropriate touching. Decision at 25-26. While crediting the balance of the paraprofessional's testimony, the Hearing Officer discredited her explanation that she wanted a monitor when toileting M.R. based on best practice as she was taught both when she was certified and in other jobs. The Hearing Officer also relied on her own lack of knowledge of such a best practice. Decision at 25. Based on this reasoning, she ordered the School to cease immediately the practice of having a monitor present during M.R.'s toileting. Decision at 26.

Finally, the Decision addresses the need for a new IEP meeting and a revised IEP because the current IEP, as of the initiation of the Due Process Hearing, simply called for the School to

"[m]onitor hygiene in bathroom." Decision at 22; see P. Ex. 4 at 26. Importantly, the Hearing

Officer found that this goal should have been placed in the "Related Services" section of the IEP

and that the School's failure to do so is a "procedural violation." Decision at 28. The Decision

lays out what the parties should include in the revised IEP, including the requirement of the

Interim Order that School personnel must inspect M.R.'s buttocks and wipe when necessary, the

protocol, instructional activities to improve toileting independence, and a reference to the use of

the bidet, if that is to be continued. Decision at 22. Relatedly, the Decision closes with the order

that the School should "consult with an agency or person(s) experienced in working with autistic

persons with toileting issues, to be in attendance at the IEP meeting for this purpose." Decision

at 29.

## II. APPLICABLE LAW

### a. Standard of Review

In reviewing an IDEA administrative decision, this Court accords due deference to the

Hearing Officer's findings of fact but reviews the rulings of law *de novo*. Linda E. v. Bristol

Warren Reg'l Sch. Dist., 758 F. Supp. 2d 75, 86-87 (D.R.I. 2010). Ultimately this Court must

make an independent decision based on the preponderance of the evidence. Abrahamson v.

Hershman, 701 F.2d 223, 230 (1st Cir. 1983); see Lessard v. Wilton-Lyndeborough Coop. Sch.

Dist., 518 F.3d 18, 24 (1st Cir. 2008) (court must engage in a bounded, independent review of

hearing officer's decision). After a thorough yet deferential review, this Court is free to accept

or reject the Hearing Officer's findings in whole or in part. Town of Burlington v. Dep't of

Educ., 736 F.2d 773, 792 (1st Cir. 1984). The Court's deference to the Hearing Officer's fact

finding is in recognition that judges are not "trained pedagogues," and therefore it must "accord

deference to the state agency's application of its specialized knowledge." Lessard, 518 F.3d at

24; Roland M. v. Concord Sch. Comm., 910 F.2d 983, 989 (1st Cir. 1990) ("[j]urists are not trained, practicing educators").  The First Circuit has described the applicable standard of review as "intermediate," requiring "a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review." Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002); Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1087 (1st Cir. 1993) (intermediate level of review is "one of involved oversight"); Linda E., 758 F. Supp. 2d at 86-87 (intermediate review requires a more critical appraisal than review for clear-error).

An IDEA motion for summary judgment does not limit the Court to considering the facts in the light most favorable to the non-moving party; rather, it is a procedural device through which to decide the case on the basis of the administrative record.  Linda E., 758 F. Supp. 2d at 87 (quoting Cranston Sch. Dist. v. Q.D., C.A. No. 06–538ML, 2008 WL 4145980, at *5 (D.R.I. Sept. 8, 2008)); Mr. I. v. Me. Sch. Admin. Dist. 55, 416 F. Supp. 2d 147, 175 (D. Me. 2006) (entire administrative record is before court to review all claims).  In making its decision, the Court must impose the burden of proof on "the party challenging the outcome of the administrative decision."  See Schaffer v. Weast, 546 U.S. 49, 62 (2005); S. Kingstown Sch. Comm. v. Joanna S., CA 13-127 ML, 2014 WL 197859, at *6-7 (D.R.I. Jan. 14, 2014); Linda E., 758 F. Supp. 2d at 87 (quoting Cranston Sch. Dist., 2008 WL 4145980, at *5).  For the matters at issue on these appeals, the burden rests on the Parent to establish that the Hearing Officer should have ruled in her favor, except for the ruling that the School may not assign a monitor to observe the toileting; on the latter issue, the burden rests on the School.

### b. IDEA, Compensatory Education and Attorney's Fees

IDEA requires that states must provide all disabled children with a FAPE as a condition for receiving federal funds. 20 U.S.C. §§ 1401(9), 1412(a)(1)(A). The primary vehicle for delivery of a FAPE is the child's IEP. Lessard, 518 F.3d at 23. The IEP must include, at a minimum, the child's present level of educational attainment, the short and long term goals for his or her education, objective criteria to measure progress towards those goals and the specific services to be offered. 20 U.S.C. § 1414(d)(1)(A). It is subject to procedural and substantive requirements, which can flow from both federal and state law, to the extent that the latter is not incompatible with the former. See Roland M., 910 F.2d at 987. In interpreting IDEA, courts must heed the caution of the Supreme Court in Board of Education v. Rowley that IDEA does not require school districts to provide special education students with the best education available, or to provide instruction that maximizes the student's abilities. 458 U.S. 176, 200-01 (1982); Lt. T.B. ex rel. N.B. v. Warwick Sch. Comm., 361 F.3d 80, 83 (1st Cir. 2004). Rather, school districts are required only to provide a "basic floor of opportunity" that consists of access to specialized instruction and related services individually designed to provide educational benefits to the student, and the choice of methodology in providing special education and related services is the prerogative of the school district. Mr. I. ex rel. L.I. v. Me. Sch. Admin. Dist. No. 55, 480 F.3d 1, 10 (1st Cir. 2007); Joanna S., 2014 WL 197859, at *7. Rowley's message is clear: courts are entrusted with ascertaining the adequacy of an IEP's educational components, but not with weighing the comparative merit of the components when stacked against other heuristic methods. Lessard, 518 F.3d at 29.

When a child has been denied a FAPE, compensatory education is a proper remedy under IDEA. See Sch. Comm. of Burlington v. Dep't of Educ., 471 U.S. 359, 369 (1985); 34 C.F.R. §

300.151(b) (remedies for denial of FAPE include corrective action such as compensatory services and future services). However, while compensatory education is clearly appropriate when a child is deprived of substantive rights, it is not an appropriate remedy for a purely procedural violation. Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 19 (1st Cir. 2003) ("compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA"). Compensatory education should not be awarded where the parents have not shown that the placement is inappropriate. Carlisle Area Sch. v. Scott P., 62 F.3d 520, 537-38 (3d Cir. 1995). It also should be denied when the deficiencies suffered have already been mitigated. Phillips ex rel. T.P. v. Dist. of Columbia, 932 F. Supp. 2d 42, 50-51 (D.D.C. 2013).

In addition to compensatory education, IDEA has a fee shifting provision, which provides that reasonable attorney's fees may be awarded to the parent of a child with a disability who is the "prevailing party" in the administrative proceeding or in litigation related to a due process hearing. Smith v. Fitchburg Pub. Sch., 401 F.3d 16, 22 (1st Cir. 2005); Linda E., 758 F. Supp. 2d at 94. Specifically, 20 U.S.C. § 1415(i)(3)(B)(i)(I) provides, in pertinent part:

> In any action or proceeding under this section, the court, in its discretion, may
> award reasonable attorney's fees as part of the costs ... to a prevailing party who is
> the parent of a child with a disability.

"[A] prevailing party is any party who succeeds on any significant issue . . . which achieves some of the benefits plaintiffs sought in bringing suit." Me. Sch. Admin. Dist. No. 35, 321 F.3d at 14 (internal citation omitted). A party in a proceeding or lawsuit related to IDEA is considered "prevailing" when there is a "material alteration of the legal relationship of the parties" as well as "judicial *imprimatur* on the change." Fitchburg Pub. Sch., 401 F.3d at 22 (quoting Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 604-05 (2001)) (emphasis in original). To be a prevailing party for purposes of a fee

award, the outcome cannot be a "purely technical or de minimis victory." Me. Sch. Admin. Dist. No. 35., 321 F.3d at 15.

Even when parents qualify as prevailing parties under IDEA, they are not "automatically entitle[d]" to the full amount spent on the entire proceeding. Doe ex rel. Doe v. Attleboro Pub. Sch., 960 F. Supp. 2d 286, 299-300 (D. Mass. 2013) (quoting Gary G. v. El Paso Indep. Sch. Dist., 632 F.3d 201, 208 (5th Cir. 2011)). Rather, "the *degree* of the plaintiff's success in relation to the other goals of the lawsuit is a factor critical to the determination of the size of a reasonable fee." Doe v. Bos. Pub. Sch., 550 F. Supp. 2d 170, 173 (D. Mass. 2008) (emphasis in original) (internal citation omitted). Moreover, the court must reduce the fee award if it finds that the prevailing party unreasonably protracted the final resolution of the controversy. 20 U.S.C. § 1415(i)(3)(F)(i).

### III.    ANALYSIS

The Parent appeals from the Decision's holding that she failed to prove that the School's approach to toileting was inadequate to satisfy M.R.'s entitlement to a FAPE. She argues that the Hearing Officer's Decision ignores the School's persistent, and even willful, failure to provide a FAPE in that inadequate toileting assistance effectively barred M.R. from access to education and deprived him of the training he needs to acquire independence in toileting, a critical skill of daily living. Focusing solely on the period prior to the Interim Order, she contends that the Hearing Officer either should have applied the doctrine of issue preclusion to the Interim Order, or should have reexamined the evidence of the School's pre-Interim Order refusal to wipe, and concluded that the School failed to provide a FAPE prior to April 2, 2013. For the post-Interim Order period, she argues that the evidence establishes that M.R. did not receive a FAPE because of the inadequacy of the protocol and its implementation, including the

use of the bidet.  She also appeals from that portion of the Decision that characterizes the failure

to include the toileting goal in the "Related Services" section of the IEP as a mere "procedural"

violation, arguing that the directive to revise M.R.'s IEP reveals that the violation is truly

substantive in nature, so that M.R. is entitled to compensatory education.  She also asks this

Court to declare her a prevailing party entitled to recover attorney's fees.

The School's appeal seeks only to reverse the portion of the Decision that orders the

removal of the monitor.  It does not challenge the finding of a procedural violation or the

Hearing Officer's adoption of the holding in the Interim Order.

I deal with each argument in turn.

### a.  Collateral Estoppel Based on Interim Order

The Parent unnecessarily devotes considerable muscle to what has not been at issue since

the Interim Order issued on April 2, 2013.  She argues vociferously that the Hearing Officer

should have marshalled the doctrine of issue preclusion[15] to estop the School from relitigating

that M.R. was denied a FAPE during the pre-Interim Order period.  The problem is that the

School does not now and, since the Interim Order issued, has never sought to relitigate any of its

findings – the School disputes neither that a FAPE may include toileting nor the correctness of

the clear directive in the Interim Order that M.R.'s IEP requires wiping.  See Cedar Rapids

Cmty. Sch. v. Garrett, 526 U.S. 66, 73-74 (1999) ("related services" required by IDEA include

personal care needed for access to meaningful education); Irving Ind. Sch. Dist. v. Tatro, 468

U.S. 883, 890-91 (1984) (entitlement to FAPE includes services to enable children to be

educated, which can require toileting if necessary).  The School did not appeal from the Interim

---

[15] Issue preclusion bars relitigation of an issue where the prior determination involved the same parties or those in privity with them, the issue is identical and final judgment on the merits was entered in the prior proceeding.  Lee v. R.I. Council 94, 796 A.2d 1080, 1084 (R.I. 2002).

Order, but rather began work immediately to develop a protocol for compliance. Without compulsion by the Hearing Officer or this Court, the School convened an IEP meeting as a result of which it has already provided M.R. with the compensatory education ordered by the Commissioner to cover the time lost because the School was refusing to wipe.

The Parent's argument that this Court should apply the doctrine of issue preclusion raises a host of thorny legal questions[16] that simply need not be resolved. See Joanna S., 2014 WL 197859, at *12-15 (discussing *res judicata* in IDEA setting). With the Parent and the School not disputing that M.R.'s IEP requires that the School perform a final wipe, the Decision adopts in its entirety the Interim Order as a correct articulation of the level of toileting assistance required for a FAPE in M.R.'s circumstances. Decision at 20-22. Accordingly, it is unnecessary to decide whether the Hearing Officer erred when she rejected the Parent's collateral estoppel argument. Decision at 8.

This tempest is not just in a teapot. The Parent's energy in pressing this argument rests on her belief that she cannot recover attorney's fees for the pre-Interim Order litigation unless this Court reverses the Hearing Officer's finding that M.R. was not denied a FAPE. Meanwhile, the School argues that the Interim Order litigation is a separate case that is now terminated and cannot be the subject of a fee award. I disagree with both perspectives. The Interim Order administrative proceeding is an independent legal action in which the Parent prevailed; when separate litigation over an IDEA interlocutory order results in a material determination in the parent's favor that substantively alters the relationship of the parties, the parent may be deemed a "prevailing party" for purposes of IDEA fee shifting. Me. Sch. Admin. Dist. No. 35, 321 F.3d at 15-16 (interlocutory order that confers substantive injunctive relief sufficient to carry the weight

---

[16] For example, it is not clear whether the Interim Order has the requisite finality. While it purports to provide "interim relief," it also states, "our ruling herein is a final disposition of this issue." P. Ex. 20 at 4.

of a fee award); see E.D. ex rel. Doe v. Newburyport Pub. Sch., 654 F.3d 140, 143-44 (1st Cir. 2011) (eligibility for fee award not lost when subsequent events render claim moot); Antonio ex rel. Mother v. Bos. Pub. Sch., 314 F. Supp. 2d 95, 98 (D. Mass. 2004 ) (federal court may award IDEA fees for work done in separate state proceeding); Martin A. Schwartz & John E. Kirklin, Section 1983 Litigation Statutory Attorney's Fees § 2.10 (Aspen 2014) (nonfinal success at interlocutory stage of litigation can provide basis for fee award). The Interim Order ended what had been the primary dispute between these parties as a result of the judicial actions of the Commissioner's hearing officer; accordingly, the Parent is the prevailing party in that matter and the legal work to procure it merits an award of attorney's fees. See Fitchburg Pub. Sch., 401 F.3d at 26 (court must identify change in legal relationship between parties and ask whether it was effected by judicial actions of hearing officer); Pierre v. Providence Sch. Bd., No. PC20133422, 2014 WL 2807237, at *7 (R.I. Super. Ct. June 16, 2014) (guardian for student is prevailing party when administrative proceeding seeking Interim Order terminated in student being allowed to return to classes).

By contrast, the litigation filed in this Court to enforce the Interim Order was not successful. Indeed, this Court specifically found that the Parent was not a prevailing party for purposes of a fee award in the discrete phase reflected in both North Kingstown II, at *3 n.6, and North Kingstown III, at *3. This lack of success "is a factor critical to the determination of the size of a reasonable fee, not to eligibility for a fee award at all." Bos. Pub. Sch., 550 F. Supp. 2d at 173 (internal citation omitted). "The Supreme Court has made clear that a party's degree of success relative to what it originally sought in the lawsuit should be considered when determining the reasonableness of the amount of an award but not when determining whether a party prevailed." Id. In addition, IDEA requires a reduction in the fee award if the court finds

that the prevailing party unreasonably protracted the final resolution of the controversy. 20 U.S.C. § 1415(i)(3)(F)(i). Here, the Parent's decision to rush into court on April 4, 2013, instead of sitting down with the School at an IEP meeting to develop a resolution, has unreasonably protracted this controversy. Accordingly, while I find that the Parent was a prevailing party in the administrative proceeding that resulted in the Interim Order, I also find that her fee award should be reduced to reflect her lack of success in, and the unreasonable protraction of the controversy by, the litigation to enforce the Interim Order after April 2, 2013.

### b. Adequacy of Toileting Protocol

Focusing on the post-Interim Order period, the Parent's attack on the adequacy of the toileting protocol relies on the School's failure to keep M.R. clean based on the soiled underwear that continued to come home with him from time to time. The evidence presented to the Hearing Officer, corroborated by the supplemental evidence, all of which is essentially the same as that presented to this Court during the evidentiary hearing that resulted in North Kingstown III, establishes that M.R. did not have soiled underwear at home, in wrap-around services or during his summer placement, yet he continued to have soiled underwear at School. Both parties presented conflicting evidence as to possible reasons. However, both this Court and the Hearing Officer found that the paraprofessional was wiping M.R. consistent with the requirements of the Interim Order. Decision at 24; see North Kingstown III, at *1-2 (paraprofessional's testimony that she was wiping as required by the Interim Order found credible). Moreover, noting that she could speculate that the wiping was not always done thoroughly, the Hearing Officer found that any lapses in the School's performance of this function are impossible to detect where there is no "direct observation by a neutral party of the implementation of the Protocol, or of [M.R.'s] underwear right after a visit to the bathroom." Decision at 28. As a result, the Hearing Officer

rejected the Parent's argument that soiled underwear proves the School's ongoing refusal to wipe. Decision at 28. She also found that the medical reports from the gastroenterologist somewhat corroborated the School's claim that diet and gas might play a role in soiling. Decision at 27.

I do not disagree. I find that the preponderance of the evidence in the record is consistent with the Hearing Officer's findings. Mindful that this Court should defer to her educational expertise, I recommend that this Court affirm Hearing Officer's Decision that the Parent failed to sustain her burden of proving that the toileting protocol and the School's implementation of it were so flawed as to constitute the denial of a FAPE.

### c. Bidet

One of M.R.'s wrap-around service providers suggested consideration of a bidet at an IEP meeting held during the period when the School, perhaps due to pressure from its paraprofessional union, was taking the position that its personnel would not physically participate in M.R.'s toileting either by checking his buttocks or by wiping. School's Statement of Undisputed Facts ("SSUF") ¶¶ 24, 30; Parent Justine R.'s Statement of Disputed Facts ("PSDF") ¶ 24. The School gave serious consideration to the suggestion, acquired a bidet and dedicated an assistant occupational therapist to teach M.R. to use it. SSUF ¶ 39; PSDF ¶ 39. The Parent is opposed to the bidet believing that it is a device used to avoid wiping, which her son does not like and she does not trust; she believes it is the cause of at least one mishap when M.R. came home with a shirt both wet and soiled.[17] The Hearing Officer more neutrally considered the use of the bidet to be an appropriate attempt by the School to achieve cleanliness

---

[17] The Parent's argument places great emphasis on one occasion when M.R. came home wearing a different shirt, with the shirt he had worn to School soiled and wet in a plastic bag. She attributes this to improper use of the bidet. A single accident in the management of this nearly four hundred pound impaired adolescent does not translate into the denial of a FAPE. This evidence was presented to and rejected by this Court in North Kingstown III, at *2, and was presented to and disregarded by the Hearing Officer. Decision at 22-24; Hr'g Tr. 84-87, Vol. I., May 15, 2013.

for M.R. while allowing him greater independence in wiping himself. In her Decision, she finds that the bidet reflects the School's effort to achieve cleanliness and that it may well enhance cleanliness, particularly in light of M.R.'s obesity. Decision at 23. Given the School's acceptance of the Interim Order and commitment to comply, coupled with the evidence accepted by the Hearing Officer that the bidet was used to complement, not as a substitute for, wiping, the Hearing Officer left it to the discretion of the IEP Team to determine whether its use should be continued. Decision at 22. I find that this determination is well supported by a preponderance of the evidence and that the Parent has not met her burden of establishing that the School's use of the bidet deprived M.R. of a FAPE.

### d. Monitor

The toileting protocol does not mention a monitor to observe M.R.'s toileting. Rather, the evidence establishes that the paraprofessional adopted the practice on her own initiative based on "best practice" because:

> It's a good practice. I was always – that's what I was taught in my certification class and my previous jobs. I was always told that if you're in a bathroom and pants come down, you always have a second person with you.

Hr'g Tr. 58, 94, 95-96, Vol. IV, June 28, 2013. The paraprofessional never discussed the monitor with the Parent or the Director of Pupil Services. Hr'g Tr. 38, Vol. I, May 15, 2013; Hr'g Tr. 93-94, Vol. IV, June 28, 2013; see Hr'g Tr. 88, Vol. II, June 12, 2013. The Parent found out about it from testimony in this Court during the evidentiary hearing held on June 10, 2013. Hr'g Tr. 87-88, Vol. I, May 15, 2013; see North Kingstown III, at *1 (paraprofessional testified that a second staffer is always present). Then, during the Due Process proceeding, Parent learned that the union president was one of the monitors, even though she was not involved in M.R.'s care. The involvement of the union president certainly raises a question

whether best practice was the real motivation for including at least the union president as a monitor.

I cannot disagree either with the Parent's extreme discomfort with this situation or the Hearing Officer's order that it must cease. However, I also find that the Hearing Officer's Decision is overbroad in that it appears to suggest that the practice of having a monitor in the bathroom is never appropriate because it is not consistent with any recognized best practice. Decision at 25; see Bd. of Educ. of Indep. Sch. Dist. No. 92 v. Earls, 536 U.S. 822, 830 (2002) ("A student's privacy interest is limited in a public school environment where the State is responsible for maintaining discipline, health, and safety."). Indeed, the Hearing Officer contradicts the breadth of this holding three pages later in the Decision, where she notes that direct observation of the toileting by a neutral party would be a useful way to determine how M.R.'s underwear is becoming soiled. Decision at 28. This concern about overbreadth is not merely hypothetical – the School's appeal from the Decision is entirely based on the fear that it may fairly be read as barring the School from using what it contends is best practice and from exercising flexibility in discharging its obligation to maintain safe schools. See R.I. Gen. Laws § 16-2-17 (establishing right of student and staff to attend schools that are safe and secure); Schaill ex. rel. Kross v. Tippecanoe Cnty. Sch. Corp., 864 F.2d 1309, 1321 (7th Cir. 1988) (courts must grant significant weight to informed exercise of school officials' administrative discretion particularly as related to students' health and safety); Cirelli v. Johnston Sch. Dist., 897 F. Supp. 663, 665-66 (D.R.I. 1995) (case law overwhelmingly supports proposition that the health and safety of staff and students is a matter of public concern); Pierre, 2014 WL 2807237, at *2, 8-9 (school's duty to protect safety of students substantially justified its denial of FAPE under state law by barring student from school until mental health status clarified).

There is no question that the dignity of the student is a factor to be considered under IDEA. Polk v. Cent. Susquehanna Intermediate Unit 16, 853 F.2d 171, 181 (3d Cir. 1988) (proponents of Act advocated for dignity of handicapped children). For example, in Gwinnett Cnty. Sch. Dist. v. J.B. ex rel. D.B., 398 F. Supp. 2d 1245, 1270 (N.D. Ga. 2005), the court held that a school providing a FAPE to a student with cerebral palsy should limit caretakers who address personal needs to a small group otherwise involved with the student to protect and preserve the student's dignity. Gwinnett does not hold that the presence of two caretakers during toileting, both appropriately involved with and knowledgeable of the student's needs, is inherently undignified; rather, it supports the more narrow proposition that a monitor like the union president, who has nothing to do with M.R.'s care, is inappropriate.

This Court's own survey of public sources[18] suggests that the paraprofessional's testimony about best practice was spot-on: a quick search turned up multiple iterations of the same theme – that a second adult is preferred whenever a caretaker is dealing with an unclothed minor or patient, particularly of the opposite sex. See, e.g., Duggan v. Bd. of Registration in Nursing, 925 N.E.2d 812, 816-17 (Mass. 2010) (male nurses who provide intimate care to female patients should adhere to practice of being accompanied by chaperone to "safeguard patient safety and dignity"); American Medical Association, Medical-Ethics Opinion 8.21 (1998), http://www.ama-assn.org//ama/pub/physician-resources/medical-ethics/code-medical-ethics/opinion821.page, (protocol of having chaperones available on a consistent basis for patient examinations is recommended); American College of Obstetricians and Gynecologists, Committee on Ethics Opinion 373 (2007), http://www.acog.org/~/media/Committee%20 Opinions/Committee%20on%20Ethics/co373.pdf?dmc=1, ("request by either a patient or a

---

[18] The Court can take judicial notice of public sources whose accuracy cannot reasonably be questioned. See United States v. Bello, 194 F.3d 18, 23 (1st Cir. 1999).

physician to have a chaperone present during a physical examination should be accommodated regardless of the physician's sex").  Confirming the paraprofessional's specific testimony is "The ABCs of Safety and Health," published by the United Federation of Teachers, which discusses toileting protocols in the public school setting for disabled children and states, "**It is strongly recommended that <u>two</u> adults always be present when performing these tasks**." <u>Guidelines for Paraprofessionals</u>, http://www.uft.org/ files/attachments/abcs-of-safety-and-health-for-paraprofessionals.pdf (emphasis in original).

In sum, I find the Hearing Officer's order to cease the use of a monitor is justified because, as implemented during M.R.'s toileting, it was inappropriate and undignified in that it included an individual not otherwise involved in M.R.'s education or care.  <u>See</u> <u>Gwinnett</u>, 398 F. Supp. 2d at 1270.  However, I also recommend that this Court clarify that the holding is limited to this circumstance; it may not be generalized to an absolute prohibition on the appropriate use of a monitor to assist with toileting in the future.  Put differently, if the School wishes to modify the toileting protocol to add a second adult as a neutral observer, it may do so if its plan is presented to the IEP Team for discussion at an IEP meeting that includes the Parent and if the implementation is done in a fashion that recognizes M.R.'s rights of dignity and privacy, particularly by limiting potential monitors to the small group already involved in M.R.'s education and care.  <u>Id.</u>; <u>see</u> R.I. Gen. Laws § 16-2-17 (establishing right of student and staff to attend schools that are safe and secure); <u>Daniels v. Fluette</u>, 64 A.2d 302, 306 (R.I. 2013) (school has discretion in ensuring student safety, no duty absent foreseeable harm based on prior acts or other factors); <u>Pierre</u>, 2014 WL 2807237, at *3-4, 8-9 (discussing school's duty to protect safety of students); Richard S. Boothby, Note, <u>Safety First: Student Discipline Under the 1997 Amendments to the IDEA and the Need for Further Reform</u>, 63 Ohio St. L.J. 1683, 1685 (2002)

(purpose of 1997 Amendments to IDEA, in large part, to address need for maintaining safety in schools and to giving school officials tools needed to achieve this goal).

A closing comment on the dispute over the monitor: I do not find that the Parent's limited success on this minor issue converts her into a "prevailing party" for purposes of attorney's fees. Me. Sch. Admin. Dist. No. 35, 321 F.3d at 14 ("a prevailing party is any party who succeeds on any significant issue . . . which achieves some of the benefits plaintiffs sought in bringing suit") (internal citation omitted). Rather, this issue is insignificant in the context of the overall Due Process proceeding. Further, the Parent's success is mixed – I disagree that the School failed to establish that the presence of a second person during toileting can be consistent with best practice if implemented properly. Based on the evidence and the holdings in Duggan and Gwinnett, I find that the presence of the union president was offensive and needed to stop, but that, otherwise, the School established that the assignment of a monitor is a sensible way to protect the paraprofessional from new accusations (for example, that she is not doing her job as the Parent has repeatedly charged), to assess the adequacy of the wiping and to enhance, not detract from, M.R.'s dignity.

> **e. Procedural Violation**

The Hearing Officer found a procedural violation in the School's failure to include the wiping protocol in the "Related Services" section of M.R.'s IEP, but did not find the denial of a FAPE as a result. See Deal v. Hamilton Cnty. Bd. of Educ., 392 F.3d 840, 854 (6th Cir. 2004) (only if a procedural violation results in substantive harm constituting denial of FAPE may IDEA relief be granted); Cleveland Heights–Univ. Heights City Sch. Dist. v. Boss ex rel. Boss, 144 F.3d 391, 398 (6th Cir. 1998) ("minor technical violations may be excused"). The Parent argues that this is error because the real violation is substantive, as reflected in the Hearing Officer's

directive that the parties convene an IEP meeting with the Parent present to revise the IEP and properly reflect M.R.'s educational plan and goals regarding toileting. Because the refusal to conduct an IEP meeting that includes the parent would constitute the denial of a FAPE, the Parent contends that this directive exposes that the violation is substantive requiring compensatory education and making her a prevailing party for purposes of attorney's fees. Some background is required to evaluate her claim.

The IEP in place as of the commencement of the Due Process Hearing had been assembled in May 2012, almost a year before the Interim Order. "Monitor hygiene in bathroom" is listed in the "Supplementary Aids and Services" section of this IEP; this is the provision that the Interim Order interpreted as requiring that M.R.'s toileting must include wiping by School personnel. The 2012 IEP did not mention wiping and did not include the wiping protocol because it did not yet exist. S. Ex. 4. By its terms, the 2012 IEP was scheduled to expire on May 14, 2013. See 34 C.F.R. § 300.324(b)(i) (IEP must be reviewed at least annually).

The Interim Order was delivered to the parties after 5:00 p.m. on April 2, 2013. Within twenty-four hours after it issued, a teacher at the School mentioned to the Parent that the IEP Team would need to convene an IEP meeting to implement the Interim Order. The Parent misinterpreted the suggestion as an expression of intent not to comply with the Interim Order. The next day, she filed suit in the Superior Court. North Kingstown II, at *1-2 (Parent's decision to sue School two days after Interim Order based on teacher's comment about need for new IEP meeting to implement compliance). The School tried again prior to the commencement of the Due Process Hearing – on May 12, 2013, it asked the Hearing Officer to postpone the Hearing so that an IEP meeting could be convened. Decision at 8-9. This request was denied because the

Hearing Officer concluded that it would be better to address the issue first during the Due Process Hearing. Decision at 9.

While the testimonial portion of the Due Process Hearing was still ongoing, on June 14 and 27, 2013, the IEP Team finally convened a pair of meetings attended by the Parent and her attorney. As a result, a new IEP was prepared, incorporating the toileting protocol (which complies with the Interim Order): the new language states, "[m]onitor hygiene and follow attached protocols."[19] P.'s Suppl. R., Ex. 2 at 26 attached to Ex. A. At these meetings, the parties agreed on the summer program at Sargent to comply with the Interim Order's determination that M.R. is entitled to compensatory education. At the June 28, 2013, session of the Due Process Hearing, the parties advised the Hearing Officer that they had conducted an IEP meeting and resolved compensatory education for the period prior to the Interim Order. Hr'g Tr. 3-4, Vol. IV, June 28, 2013. Regarding toileting, they told her that "the only issue that's left for the Hearing Officer to decide is any issue having to do with the toileting and the protocol used for toileting." Hr'g Tr. 4, Vol. IV, June 28, 2013.

In her decision, the Hearing Officer acknowledged that the School already included toileting in M.R.'s IEP, referring to the May 2012 version because she was not aware of alteration in the June 27, 2013, version. She found the IEP deficient in that toileting should have been addressed in the "Related Services" section of the IEP, but labelled the violation procedural. Going forward, she directed the parties to convene a meeting of the IEP Team, which must include the Parent, and to revise the IEP to reflect the directive of the Interim Order. Specifically, she directed that the revised IEP "must" include "all parts that are completed for the

---

[19] The Parent contends that she attempted to discuss the toileting protocol at the June 27, 2013, IEP meeting but that the School refused. PSUF ¶ 121. The School asserts that this fact is disputed. SSDF ¶ 121. The record reveals that the parties discussed at least how to reflect the toileting protocol in the IEP, which was modified as described in the text. P.'s Suppl. R., Ex. 1 attached to Ex. A.

other goals/objectives in the IEP (e.g., as with academic areas)" and that it "should" reference the requirements of the Interim Order, the protocol and instructional activities related to personal hygiene. Decision at 22. By the time she issued this directive, the School (unbeknownst to her) was already in compliance with at least part of her directive as a result of the June 27, 2013, IEP meeting, attended by the Parent and her attorney, which incorporated the protocol into the IEP.

The Parent's argument focuses on the Hearing Officer's directive that the School must convene an IEP meeting that includes input from the Parent. Knable v. Bexley City Sch. Dist., 238 F.3d 755, 765-66 (6th Cir. 2001). She emphasizes that the School did not include the Parent in the development of the protocol and that it took the School more than two weeks to get her a copy of the protocol, a delay that the Hearing Officer found exacerbated the atmosphere of controversy. Decision at 23. She reprises her distrust of the bidet and the bathroom monitor, arguing that these too are the result of the lack of an IEP meeting. She points to the Hearing Officer's instruction that the revised IEP should cover not only the matters addressed by the Interim Order (as set out in the protocol), but that it also should include instructional activities for increasing independence with personal hygiene and a description of any device (such as the bidet) that is to be used. The need to direct the School to do all of this, she contends, adds up to the denial of a FAPE.

I find that the Hearing Officer did not err in concluding that her directive regarding the convening of a new IEP meeting was to address a procedural deficiency and not the substantive denial of a FAPE. A new IEP meeting that includes the Parent amounts to no more than what the School had been willing to do since the Interim Order. In Smith v. Fitchburg Public Schools, the court held that a ruling requiring the school district to convene a IEP meeting that amounted to no more than requiring the school to follow through with what it had already voluntarily

promised to do was not appropriate for an award of attorney's fees. 401 F.3d at 27. Further, the Parent's primary issue had been successfully resolved by the Interim Order and the School's willingness to have an IEP meeting with the Parent to implement it; the specific revisions the Hearing Officer suggests, as listed in her Decision, are *de minimis* in comparison. See Linda T. ex rel. William A. v. Rice Lake Area Sch. Dist., 417 F.3d 704, 708-10 (7th Cir. 2005) (parent is not the prevailing party for purpose of attorneys' fees where the ordered revisions were *de minimis* in comparison to the primary issue of placement, which district won); Perry A. Zirkel, The Remedial Authority of Hearing & Review Officers Under the Individuals with Disabilities Education Act: An Update, 31 J. Nat'l Ass'n Admin. L. Judiciary 1, 16-17 (2011) (hearing officer may suggest revisions to IEP, but should not usurp responsibility of IEP team and such suggestions should not automatically make parent "prevailing party").

### f. Compensatory Education

In light of my recommendation that this Court should affirm the Hearing Officer's determination that there was no denial of a FAPE once the Interim Order issued, there is no need to address the parties' arguments over whether the Parent's demand for compensatory education was waived because it was not preserved in the Request for the Due Process Hearing. M.R. has received compensatory education for the period of lost time caused by the School's untenable pre-Interim Order position that its personnel would not wipe; once the School abandoned that stance, it was committed to providing a FAPE, as the Hearing Officer found. With no other deprivation of substantive rights, no more compensatory education is required. Me. Sch. Admin. Dist. No. 35 v. Mr. R., 321 F.3d 9, 19 (1st Cir. 2003) ("compensatory education is not an appropriate remedy for a purely procedural violation of the IDEA").

## IV.     CONCLUSION

Prior to the Interim Order, the School was not meeting the standards of IDEA in that its refusal to wipe deprived M.R. of a FAPE; by so holding, the Interim Order profoundly altered the legal relationship of these parties.  M.R. has already received compensatory education to cover the time lost as a result of that violation.  I find that the Parent was the prevailing party in the Interim Order administrative proceeding so that she may recover her reasonable attorney's fees, but that her fees should be limited to reflect that the litigation she initiated to enforce the Interim Order, including her appeal to the Circuit, was unsuccessful and unreasonably protracted the final resolution of the controversy.

Once the Interim Order was in place, the School did not dispute any aspect of it, issued a directive to avoid the union issue, developed a protocol aimed at full compliance and tried to convene an IEP meeting to discuss compliance.  Whether the School was genuinely attempting to comply was the subject of testimony before the Hearing Officer, resulting in the findings that the Parent failed to prove either lack of compliance or the denial of a FAPE in the post-Interim Order period.  Mindful of the Supreme Court's holding that the duty of the state is to deliver an "'adequate' education," Rowley, 458 U.S. 209-10, I find that the preponderance of the evidence is consistent with these findings.  Accordingly, I also find that no further compensatory education is required.

With respect to attorney's fees in connection with the Due Process proceeding, I find that the School prevailed on the issue that is the gravamen of the Parent's claim.  While the Hearing Officer tweaked and made suggestions, for example, to get rid of the unauthorized monitor, to revise the IEP and to be more inclusive of the Parent in the decision to use the bidet, her bottom line is pellucid – the School is the prevailing party.  She ruled in favor of the Parent only on the

School's minor procedural error in not placing the toileting protocol in the "Related Services" section of the IEP. Accordingly, I do not find that the Parent is a prevailing party entitled to attorney's fees for the Due Process proceeding.

To recap, based on my review of the Hearing Officer's thoughtful Decision, my independent review of the record including the supplemental materials, and with deference to the Hearing Officer's educational expertise, I recommend that this Court enter judgment affirming the Decision. With respect to the pending motions, I recommend that the Parent's motion for summary judgment (ECF No. 15) should be denied as to all issues, except that it should be granted to the extent that it seeks to affirm the order that the monitoring must cease and to the extent that it seeks attorney's fees in connection with the administrative proceeding culminating in the Interim Order. Relatedly, I recommend that the Parent be granted leave to file a motion for fees in conformity with the requirements of DRI LR Cv 54.1. I further recommend that the School's motion for summary judgment (ECF No. 11) be granted as to all issues, except that it should be denied to the extent that it seeks to reverse the order that the monitoring must cease and to the extent that it seeks a ruling that the Parent is not entitled to reasonable attorney's fees in connection with the administrative proceedings culminating in the Interim Order. Finally, I recommend that this Court clarify that the Hearing Officer's order that the monitoring practice described in the testimony at the Due Process Hearing must cease is to be narrowly interpreted so that, in the future, the School may incorporate a monitor into its toileting protocol as long as it is done using a procedure discussed at an IEP meeting and developed with M.R.'s privacy and dignity in mind.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting

party.  <u>See</u> Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a

timely manner constitutes waiver of the right to review by the district judge and the right to

appeal the Court's decision.  <u>See</u> <u>United States v. Lugo Guerrero</u>, 524 F.3d 5, 14 (1st Cir. 2008);

<u>Park Motor Mart, Inc. v. Ford Motor Co.</u>, 616 F.2d 603, 605 (1st Cir. 1980).


<u>/s/ Patricia A. Sullivan</u>
PATRICIA A. SULLIVAN
United States Magistrate Judge
June 27, 2014